EDWARD DALY *v.* LAWRENCE F. DELPONTE,
COMMISSIONER OF MOTOR VEHICLES
(10372)

LAVERY, LANDAU and HEIMAN, Js.

Argued February 19—decision released May 5, 1992

*Lawrence W. Berliner,* with whom, on the brief, was *Catherine Cushman,* for the appellant (plaintiff).

*Cornelius F. Tuohy,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (defendant).

HEIMAN, J. The plaintiff, Edward Daly, appeals from the trial court's judgment dismissing his appeal from the decision of the defendant, the commissioner of motor vehicles for the state of Connecticut, suspending his driver's license and requiring him to submit certain medical reports as a condition of reinstatement and retention of that license. He claims that the trial court (1) incorrectly determined that his substantial rights were not prejudiced by the defendant's decision, (2) incorrectly determined that the defendant's prejudgment decision summarily suspending his license comported with General Statutes § 4-182, (3) improperly failed to consider whether the defendant's actions violated the equal protection clause of the Connecticut constitution, (4) incorrectly determined that the defendant's action was not arbitrary, capricious, illegal or an abuse of discretion, and (5) improperly failed to consider the effects of certain claimed ex parte communications made by the defendant. We affirm the trial court's judgment.

The facts necessary to resolve this appeal may be summarized as follows. In 1986, the plaintiff, an inspector employed by the department of motor vehicles (DMV), was treated by Michael Krinsky, a neurologist, after experiencing a seizure. As a result of the seizure, the defendant required the plaintiff to submit a P-142N, a DMV neurological medical report form, periodically. In a P-142N dated January 19, 1989, Krinsky indicated that the plaintiff was taking his anticonvulsant medication as instructed.

On May 4, 1989, the plaintiff suffered another seizure while on his lunch break at Max's Pizza restaurant in Bloomfield and was taken to Mount Sinai Hospital for treatment. As a result of this incident, the plaintiff was relegated to office duties upon his return to work and was prohibited from driving a state vehicle until his condition could be evaluated further. The plaintiff was notified by letter dated March 23, 1989, that the defendant summarily had placed him on medical probation, a period during which he was required, under threat of having his driver's license suspended, to submit medical reports to the DMV. In a letter dated May 16, 1989, Krinsky confirmed that the plaintiff had suffered a seizure recently, that his anticonvulsant medication was increased as a result of the seizure and that he was approved to resume his regular duties at work.

The plaintiff submitted another P-142N signed by Krinsky on May 25, 1989. Upon receiving the May 25, 1989 P-142N, Gladys O. Johnson, the chief of the drivers services division of the DMV, wrote to John T. Hornblow, a neurologist and then chairman of DMV's medical advisory board, soliciting Hornblow's opinion regarding the plaintiff's fitness to drive. To aid Hornblow in his analysis, Johnson enclosed medical reports and a letter signed by Krinsky as well as a memo from Lieutenant Lee Telke of the DMV, an eyewitness to the May 4, 1989 seizure. In a letter dated June 12, 1989, Hornblow informed Johnson that although he had misgivings about the plaintiff's ability to drive safely, he had not yet consulted with Krinsky. In a letter dated June 26, 1989, Hornblow informed Johnson that, because he still had been unable to confer with Krinsky and therefore did not have the optimum data on which to base a recommendation, he felt that the plaintiff's license should be suspended until his medication requirements could be assessed.

Johnson notified the plaintiff by letter dated July 22, 1989, that the defendant had ordered his driver's license suspended effective August 5, 1989, on the basis of a finding that his continued operation of a motor vehicle would be dangerous to himself and to others. The letter further advised the plaintiff of his right to request a presuspension hearing.

On August 1, 1989, the plaintiff requested a presuspension hearing. Consequently, Johnson sent a memorandum to Michael Krochmalny, chief of the DMV's adjudications division, requesting that he schedule a hearing concerning whether the plaintiff's driver's license should be suspended. The defendant notified both the plaintiff and Krinsky that a hearing was scheduled for August 15, 1989.

On August 15, 1989, the parties negotiated a proposed stipulated settlement agreement that was tentatively accepted by Michael Ross, a DMV hearing officer, on the condition that the defendant approve it. The defendant notified the plaintiff's attorney that after reviewing the agreement and the plaintiff's file and consulting with Johnson and Hornblow, he was unable to approve the agreement. He further stated that he would request Krochmalny to schedule a full hearing on the matter.

A license suspension hearing was held on September 21, October 26, and December 6, 1989, before DMV hearing officer William Grady. On January 2, 1990, Grady issued his decision, finding that the plaintiff was "not a proper person to hold a Connecticut operator's license based on available medical evidence." As a result of Grady's findings, the defendant ordered that (1) the August 5, 1989 suspension remain in effect until May 4, 1990, (2) on May 4, 1990, the plaintiff become eligible for reinstatement of his driver's license, (3) in the event that the plaintiff's driver's license was rein-

stated, he submit P-142Ns to the DMV every three months, commencing with the date of reinstatement, for a period of three years, and (4) the plaintiff submit a P-142N to the DMV within seven days of any subsequent consciousness altering event or seizure.

The plaintiff appealed to the Superior Court, which rendered judgment dismissing the appeal on June 11, 1991. At some time before the trial court rendered its judgment, the plaintiff's license suspension had expired and his license had been reinstated. This appeal followed.

I

The plaintiff first claims that the trial court incorrectly concluded that the defendant did not act unreasonably, arbitrarily, illegally or in abuse of its discretion in placing him on medical probation. He specifically argues that the defendant was without the statutory or regulatory authority to place him on medical probation. We disagree.

The plaintiff attacks both the defendant's March, 1989 decision summarily placing him on medical probation and that portion of the defendant's January 2, 1990 decision requiring him to submit P-142N forms as a condition of reinstatement and retention of his suspended license.

The plaintiff's claim with respect to the March, 1989 decision summarily placing him on medical probation is moot. The defendant's license was suspended from August 5, 1989, to May 4, 1990, rendering this condition on his ability to retain his license during this period meaningless. Moreover, the postsuspension reporting requirements were not a continuation of the March, 1989 medical probation but were new requirements that became effective when the plaintiff's license was reinstated. This conclusion is bolstered by the fact that

although the term "medical probation" is used in the March, 1989 letter from the defendant to the plaintiff, it is not used in the defendant's January, 1990 order. Because the March, 1989 medical probation terminated on August 5, 1990, the plaintiff's challenge to it is moot. See *Furstein* v. *Hill,* 218 Conn. 610, 627, 590 A.2d 939 (1991); *Phaneuf* v. *Commissioner of Motor Vehicles,* 166 Conn. 449, 453, 352 A.2d 291 (1974). As such, we will not consider this claim.

We turn next to the plaintiff's attack on the postreinstatement reporting requirements. The trial court found that the defendant's authority to require the plaintiff to file postreinstatement medical reports was derived from General Statutes (Rev. to 1989) § 14-36 (e), which states in pertinent part: "If any applicant [for a Connecticut driver's license] suffers from any physical defect or from any disease which might affect the operation by him of a motor vehicle, the commissioner may require the applicant to demonstrate personally that, notwithstanding such defect or disease, he is a proper person to operate a motor vehicle, and he may further require a certificate of such applicant's condition . . . . A license, containing such limitation as the commissioner deems advisable, may be issued in any case . . . ." The plaintiff first claims that the trial court improperly relied on this statute because he was not an applicant for a Connecticut driver's license. The trial court properly relied on this statute. The defendant's January, 1990 order states that the plaintiff's license was to remain suspended until May 4, 1990, when he would be "eligible" for reinstatement. The order clearly contemplates that the plaintiff would be applying for reinstatement of his license after that date. For the purposes of the postreinstatement reporting requirements, therefore, the plaintiff was an applicant as that term is used in the statute.

The plaintiff next claims that the statute, by its express terms, applies only to those applicants "who [have] not held a Connecticut motor vehicle operator's license during the preceding two years . . . ." Although the plaintiff accurately quotes this statutory language, his reliance on it is misplaced. The quoted passage is taken from the first portion of General Statutes (Rev. to 1989) § 14-36 (e), which states in pertinent part: "Before granting a license to any applicant who has not held a Connecticut motor vehicle operator's license during the preceding two years, the commissioner shall require the applicant to demonstrate personally to him . . . that the applicant is a proper person to operate motor vehicles of the class for which he has applied, has sufficient knowledge of the mechanism of the motor vehicles to ensure their safe operation by him and has satisfactory knowledge of the laws concerning motor vehicles and the rules of the road. If any such applicant has held a license from a state . . . where a similar examination is required . . . the commissioner may waive part or all of the examination in his discretion. . . ." The language referring to an applicant who has not held a Connecticut driver's license during the preceding two years merely prohibits the defendant from waiving the examination requirement for such a person. It does not limit the class of applicants on whom the defendant may impose medical reporting requirements.

Our conclusion that the postreinstatement medical reporting requirements are distinct from the March, 1989 decision placing the plaintiff on medical probation leads us to reject the plaintiff's remaining challenges to the postreinstatement reporting requirements as well. The plaintiff apparently claims that the trial court improperly determined that General Statutes (Rev. to 1989) § 14-36 (e) controls this case because the plaintiff was an operator, not an applicant, at the time

of the decision in March, 1989, to place him on medical probation. He further claims that even if § 14-36 (e) applies, the defendant failed to comply with its terms because he failed to ask the plaintiff to demonstrate that he was a "proper person" to operate a motor vehicle before placing him on medical probation in March, 1989. Because each claim either purports to attack the March, 1989 medical probation, the validity of which is moot, or rests on the false premise that the postreinstatement reporting requirements were merely an extension of the March, 1989 medical probation, the plaintiff cannot prevail on either of them.

## II

The plaintiff's second and fourth claims pertain only to the defendant's decision to suspend the plaintiff's license. Because the suspension period has expired and the plaintiff's license has been reinstated, these claims are moot.

Although the parties do not raise the mootness issue, we do so sua sponte because mootness implicates this court's subject matter jurisdiction. See *Gagnon* v. *Planning Commission,* 24 Conn. App. 413, 415, 588 A.2d 1385, cert. granted, 219 Conn. 902, 593 A.2d 129 (1991). The existence of an actual controversy is an essential requisite of appellate jurisdiction. *State* v. *Haynes,* 25 Conn. App. 472, 478, 595 A.2d 902 (1991). "It is not the province of appellate courts to decide moot questions when no practical relief can follow from their determination." *Furstein* v. *Hill,* supra. We must determine, therefore, whether the plaintiff may gain any practical relief in the event that we decide these issues in his favor. Id.; *Phaneuf* v. *Commissioner of Motor Vehicles,* supra, 452.

In cases involving criminal convictions, even where the sentence has been served fully, the collateral consequences that result from the conviction of a crime

will insulate the appeal from a mootness challenge. *Pennsylvania* v. *Mimms,* 434 U.S. 106, 108 n.3, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977); *Shays* v. *Local Grievance Committee,* 197 Conn. 566, 572 n.4, 499 A.2d 1158 (1985). A driver's license suspension, however, "does not have the effect of a conviction, nor would [it] entail any of the collateral legal disabilities ordinarily produced by conviction of a criminal offense." *Phaneuf* v. *Commissioner of Motor Vehicles,* supra, 453. Where, as here, the plaintiff has failed to demonstrate that points leading to future suspensions have been entered on his record, we are "unable to perceive any collateral legal consequences which would be dispelled or remedied by an order of the court reversing the defendant's order." Id. Thus, each of the plaintiff's challenges to his license suspension became moot when his driver's license was reinstated. See id., 454.

### III

The plaintiff next argues that the defendant's decision to place him on medical probation violated the equal protection clause of the Connecticut constitution, article first, §§ 1 and 20. We disagree.

Article first, § 20, as amended by article twenty-one of the amendments to the Connecticut constitution, provides in pertinent part: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of . . . physical or mental disability." The defendant, in placing the plaintiff on medical probation, clearly singled him out on the basis of a physical or mental disability. Our constitution does not, however, forbid all discrimination based on a person's physical or mental disability. Rather, once discrimination has been uncovered, we must determine the appropriate degree of judicial scrutiny to apply. *Ryszkiewicz* v. *New Britain,* 193

Conn. 589, 596, 479 A.2d 793 (1984). " 'If, in distinguishing between classes, the statute either intrudes on the exercise of a fundamental right or burdens a suspect class of persons, the court will apply a strict scrutiny standard wherein the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest. . . .' " *Harbor Ins. Co.* v. *Groppo,* 208 Conn. 505, 509, 544 A.2d 1221 (1988); *Ryszkiewicz* v. *New Britain,* supra. Because persons with physical or mental disabilities belong to a suspect class under the Connecticut constitution, the defendant's action must be subjected to strict constitutional scrutiny.

We recognize that the strict scrutiny standard of review is more exacting than that applied by the United States Supreme Court when reviewing a disability based classification in light of the equal protection clause of the United States constitution. See *Cleburne* v. *Cleburne Living Center,* 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). Article first, § 20, of the Connecticut constitution, however, unlike the fourteenth amendment to the United States constitution, expressly forbids discrimination based on a person's physical or mental disability. Although the equal protection clauses of both the United States and Connecticut constitutions have been interpreted to provide identical protections in some instances; see *State* v. *Leary,* 217 Conn. 404, 409, 587 A.2d 85 (1991); *Plourde* v. *Liburdi,* 207 Conn. 412, 418, 540 A.2d 1054 (1988); our Supreme Court has recognized that Connecticut's equal protection clause provides protections beyond those contained in its federal counterpart. This is particularly so where the text of the Connecticut constitution is distinguishable from its federal counterpart in some material respect. See *Horton* v. *Meskill,* 172 Conn. 615, 639–53, 376 A.2d 359 (1977); compare *Dydyn* v. *Department of Liquor Control,* 12 Conn. App.

455, 464, 531 A.2d 170, cert. denied, 205 Conn. 812, 532 A.2d 586 (1987), cert. denied, 485 U.S. 977, 108 S. Ct. 1272, 99 L. Ed. 2d 483 (1988).

The framers of the disability clause intended our courts to subject disability based classifications to strict scrutiny. See R. Berdon, "Connecticut Equal Protection Clause: Requirement of Strict Scrutiny When Classifications are Based Upon Sex, Physical Disability or Mental Disability," 64 Conn. B.J. 386, 401–402 (1990). During a debate on the disability amendment in the House of Representatives, Representative Richard D. Tulisano expressly stated that the amendment was intended to guarantee that strict scrutiny is applied to such classifications. 26 H.R. Proc., Pt. 11, 1983 Sess., p. 3975. Similarly, Representative Christine M. Niedermeier argued that the disabilities clause would require the state to prove that the challenged discrimination is required by a compelling state interest. Id., 3991. Representative Naomi K. Cohen opined that the amendment would require the courts to apply the "strictest scrutiny." Id., 3993. Finally, Senator Howard T. Owens, Jr., noted that "[w]here the court finds significant state action it will subject segregation or discrimination complaints to strict judicial scrutiny and the constitutional protection shifts the burden to the state to show compelling reasons if and when there's discrimination." 26 S. Proc., Pt. 9, 1983 Sess., p. 3170. We conclude, on the basis of the text and history of article first, § 20, that the disparate treatment in this case must be subjected to strict scrutiny. Thus, the defendant's action in placing the plaintiff on medical probation will be upheld only if it is necessary to achieve a compelling state interest; *Harbor Ins. Co.* v. *Groppo,* supra; and is narrowly tailored toward achieving that goal. *Laden* v. *Warden,* 169 Conn. 540, 548–49, 363 A.2d 1063 (1975).

The state's compelling interest in highway safety is not open to serious dispute. See *Burns* v. *Barrett,* 212 Conn. 176, 184, 561 A.2d 1378, cert. denied, 493 U.S. 1003, 110 S. Ct. 563, 107 L. Ed. 2d 558 (1989). Further, placing the plaintiff on medical probation was necessary to protect this interest. In cases such as this, where an individual's fitness to drive safely reasonably is called into question, the defendant must satisfy himself that public safety is not jeopardized by allowing that person to drive. Where the defendant has reason to believe that a person may experience periodic seizures, this compelling interest in public safety requires the defendant to monitor the individual's medical condition.

The reporting requirements placed on the plaintiff are both necessary and narrowly tailored to achieve this goal. The defendant has allowed the plaintiff to drive during the reporting period. The reporting requirement is limited to a fixed three year period. Lastly, the plaintiff is not required to make generalized medical disclosures, but is required to report only those facts pertinent to his neurological disorder. Because the medical reporting requirements are necessary to achieve a compelling state interest and are narrowly tailored to accomplish that goal, they do not violate the equal protection clause of the Connecticut constitution, article first, § 20.

IV

The plaintiff's remaining claim is that the trial court improperly failed to consider the effect of the defendant's illegal ex parte communications on the plaintiff's substantial rights. We disagree.

The plaintiff bases this claim on his assertion that although he claimed before the trial court that the defendant engaged in illegal ex parte communications with members of the department's adjudications unit

and various other witnesses, including but not limited to Johnson, the trial court made no findings of fact with respect to this issue. He further notes that once a party establishes that an improper ex parte communication occurred, as he claims that he has established, the burden shifts to the opposing party to demonstrate that its opponent was not prejudiced by the prohibited communication. See *Henderson* v. *Department of Motor Vehicles,* 202 Conn. 453, 460, 521 A.2d 1040 (1987). Because the presumption of prejudice has not been rebutted, he concludes, "the defendant's decisionmaking process must be considered tainted and the ultimate judgment of the agency unfair and void." He further claims that the trial court's failure to address the issue has foreclosed effective judicial review of the proceedings.

"Our rules of practice require that the trial court state its decision on each issue in the case and its conclusion as to each claim of law raised by the parties. Practice Book § 4059." *McLaughlin* v. *Bronson,* 206 Conn. 267, 277, 537 A.2d 1004 (1988). Nonetheless, the burden remains with the appellant to demonstrate that harmful error was committed. Id., 278. The plaintiff did not file a motion for articulation with the trial court. "In the absence of a motion for articulation; see Practice Book § 4051; 'it would be sheer speculation for this court to assume that the trial court applied the incorrect legal standard.' *State* v. *Crumpton,* 202 Conn. 224, 232, 520 A.2d 226 (1987)." *DiBerardino* v. *DiBerardino,* 213 Conn. 373, 385, 568 A.2d 431 (1990). " 'It is important to recognize that a claim of error cannot be predicated on an assumption that the trial court acted incorrectly.' " *Rosenblit* v. *Danaher,* 206 Conn. 125, 134, 537 A.2d 145 (1988), quoting *Barra* v. *Ridgefield Card & Gift Gallery, Ltd.,* 194 Conn. 400, 407, 480 A.2d 552 (1984); *Giammattei* v. *DiCerbo,* 135 Conn. 159, 162, 62 A.2d 519 (1948). "Because the deficiency

in the record regarding this claim should have been remedied by the [plaintiff], we will not remand the case to the trial court for rectification." *McLaughlin* v. *Bronson,* supra.

The trial court reasonably could have found that the communications at issue, if they occurred, were not improper ex parte communications under General Statutes § 4-181. Alternatively, the court reasonably could have found that even if the communications were improper, they were harmless because Grady, the hearing officer who presided over the suspension hearing, had no knowledge of them. We will not presume that the trial court's judgment was based on a misapplication of the law.

The judgment is affirmed.

In this opinion the other judges concurred.